**MORROW NI LLP**

Complex **Disputes**

April 17, 2026

**_VIA ECF_**

Hon. Kandis A. Westmore
United States Magistrate Judge

> Re:    **Joint Discovery Letter re Quince's Motion to Retain Confidentiality Designations in** _Tapestry, Inc., et al v. Last Brand, Inc. d/b/a Quince,_ **Case No. 4:25-cv-03082-JST-KAW (N.D. Cal.)**

Dear Judge Westmore:

Pursuant to this Court's civil standing order and Order dated March 11, 2026 [ECF No. 45], the Parties, through their counsel, hereby submit a joint letter regarding whether Last Brand, Inc. ("Quince") may retain the "Highly Confidential – Attorneys' Eyes Only" ("AEO") designation of certain internal emails and documents under the Protective Order [ECF No. 32].

The parties attest that lead counsel for the parties had met and conferred via video conference on April 10, 2026. The parties further attest that they have complied with Section 9 of the Northern District's Guidelines for Professional Conduct before this filing.

Respectfully Submitted,

BLAKELY LAW GROUP

By:    _/s/ Brent H. Blakely_ _____
     Brent H. Blakely

     _Attorneys for Plaintiffs Tapestry, Inc., Coach Services, Inc., and Coach IP Holdings, LLC_

MORROW NI LLP

By:    _/s/ Xinlin Li Morrow_ _____
     Xinlin Li Morrow

     _Attorneys for Defendant Last Brand, Inc._

ATTESTATION REGARDING SIGNATURES

I, Xinlin Li Morrow, am the ECF user whose identification and password are being used to file the foregoing JOINT DISCOVERY LETTER BRIEF. In compliance with Local Rule 5-1(i)(3), I hereby attest that all parties have concurred in this filing.

          _/s/ Xinlin Li Morrow_
          Xinlin Li Morrow

Joint Letter Brief re. Quince's Motion to Retain Confidentiality Designations |
Case No. 4:25-cv-03082-JST (N.D. Cal.)

MORROW NI LLP/
Case 4:25-cv-03082-JST    Document 47    Filed 04/17/26    Page 2 of 6
Seattle | New York | Los Angeles
www.moni.law

Complex Disputes

### Quince's Statement

The documents at issue are Quince's internal emails and documents that are highly confidential— allowing Plaintiffs' in-house counsel access would cause grave competitive harm.

### A.    Quince Has Met Its Burden for the AEO Designations.

Contrary to Plaintiffs' assertions, Quince's internal emails and documents relating to manufacturers and product development are properly designated as AEO under the Protective Order—they contain highly confidential information regarding Quince's business model, manufacturer identities, IP management strategies, cost and pricing information, sourcing and design processes, internal policies, business partnerships, and operational workflows. Ex. A (summary of Quince's internal email and documents at issue). Disclosure to Plaintiffs or the public would cause Quince to suffer competitive harm. Access to these documents is strictly limited to employees who need to know such information to perform their job duties, and all such employees are bound by confidentiality obligations to maintain the secrecy of this information.[1] *Nutratech, Inc. v. Syntech (SSPF) Int'l, Inc.*, 242 F.R.D. 552, 555 (C.D. Cal. 2007) ("Courts commonly issue protective orders limiting access to sensitive information to counsel and their experts."); *Netquote, Inc. v. Byrd*, No. 07–cv–00630, 2007 WL 2438947, at *1 (D. Colo. Aug. 23, 2007) ("[w]ith regard to an attorney's-eyes-only provision, confidential information that may be used against the company by a direct competitor in the lawsuit is generally afforded more protection.").

Indeed, this Court has already determined that Quince's manufacturer identities, sourcing processes, product development strategy, and internal operational workflow warrant protection from disclosure based on competitive harm, granting sealing of those precise categories of information. ECF 44. This Court has also, in another trade dress case filed by Plaintiffs' counsel against Quince, endorsed Quince's AEO designation of internal emails and documents containing the same highly confidential information under a substantively identical protective order, finding that unsealing would harm Quince's "competitive standing." *Deckers Outdoor Corp. v. Last Brand, Inc.*, No. 3:23-cv-04850-AMO (N.D. Cal.), ECF 233, at 3-16.[2]

Redaction is not a less restrictive means when the manufacturer identities are the specific information Plaintiffs seek to de-designate.

### B.    Plaintiffs Have Not Met Their Burden to Overcome Quince's AEO Designations.

To overcome Quince's AEO designations, Plaintiffs must (i) prove prejudice by only allowing outside counsel access to the disputed information; and (ii) provide credible evidence that in-house counsel are not involved in the "competitive decision-making." Plaintiffs fail both.

*First*, where a party challenges an AEO designation, the designation must "actually prejudice presentation of [that] party's case, not merely increase[s] the difficulty of managing the litigation." *Cadence Design Sys., Inc. v. Pounce Consulting, Inc.*, 2018 WL 10582121, at *3 (N.D. Cal. May 7, 2018); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2012 WL 6160468, at *5

---

[1] Quince is prepared to submit an affidavit from Matt Lippert, similar to ECF 42-1, attesting to the statements in this paragraph, should the Court grant leave to file. ECF 42-1 (Lippert Decl.); ECF 44 (order granting Quince's sealing request); *see also* ECF 38-2 (Lippert Decl.).

[2] While these decisions involved sealing, this Court, in both instances, correctly concluded that disclosure of these documents would cause competitive harm, which stands true whether the information is released publicly or to a competitor.

1

Joint Letter Brief re. Quince's Motion to Retain Confidentiality Designations |
Case No. 4:25-cv-03082-JST (N.D. Cal.)

(E.D. Cal. Dec. 11, 2012) (citing *Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 528 (N.D. Cal. 2000)). Any prejudice must concern the asserted claims, not unasserted ones. *Am. Roller Co., LLC v. Foster-Adams Leasing, LLP*, No. 05 C 3014, 2006 WL 1371441, at *3 (N.D. Ill. May 16, 2006) ("Defendants' attempt to discover evidence … for unasserted claims is improper."). Courts have refused to uphold challenges where the challenging party fails to explain why in-house access is necessary when outside counsel already has it. *Stanislaus*, 2012 WL 6160468, at *5-6; *Hirsh Inc. v. United States*, 657 F. Supp. 1297, 1305 (C.I.T. 1987).

Here, Plaintiffs provide no justification for why their outside counsel—who has full access to Quince's internal emails and documents under the Protective Order—cannot make the necessary determinations and communicate strategy to in-house counsel without revealing Quince's competitively sensitive specifics. *Cadence*, 2018 WL 10582121, at *3. Plaintiffs' stated desire to evaluate what "other products Quince may have copied" concerns unasserted claims, which is not a proper basis for de-designation. *Am. Roller*, 2006 WL 1371441, at *3.[3]

Plaintiffs' prejudice argument also fails on its own stated terms. Outside counsel has full access to Quince's AEO-designated manufacturer identities. Outside counsel can also ascertain identities of Plaintiffs' manufacturers and their contractual obligations, if any, to Plaintiffs.[4] Outside counsel is therefore already positioned to advise whether any of Quince's manufacturers actually overlap with Plaintiffs' and whether further legal actions can be taken. **If** overlap exists and Plaintiffs wish to pursue those manufacturers, outside counsel can advise on that decision without ever disclosing Quince internal emails and documents to in-house counsel. Plaintiffs have not explained why this mechanism is insufficient. *Cadence*, 2018 WL 10582121, at *3; *Stanislaus*, 2012 WL 6160468, at *6; *Nutratech*, 242 F.R.D. at 556 ("[A]ttorneys … commonly manage to conduct discovery and litigation strategy without revealing such information to their clients.").

Plaintiffs also mischaracterize Quince's internal emails as evidence of intentional copying. Referencing a competitor's publicly sold products in product development does not constitute unlawful copying. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001). Unlike *Microvention*, where a party was denied access to its *own* stolen trade secrets, Coach seeks access to Quince's wholly independent business. *Microvention, Inc.*, 2021 WL 4840786 at *7.

*Second*, Plaintiffs have not provided the credible evidence required to show their in-house

---

[3] Plaintiffs' cases are unavailing. In *Defazio v. Hollister, Inc.*, the information "designated 'attorneys' eyes only' will be historical in nature, i.e., ***of not much interest to a competitor*** who is primarily interested in the 'now.'" 2007 WL 2580633, at *2 (emphasis added). In *Gryphon Domestic VI, LLC v. APP Int'l Fin Co.*, the defendants "are **not** competitors of plaintiffs." 28 A.D.3d at 326 (emphasis added). In *Glob. Material Techs., Inc. v. Dazheng Metal Fibre Co.*, the court did not find "good cause" to justify AEO designation because (i) the information at issue from four years ago is "stale"; (ii) there is "disturbingly murky question" as to whether the companies "can be considered competitors" or are still "functioning companies," and (iii) there is a lack of "affidavits supporting its assertions." 133 F. Supp. 3d at 1085–86. Indeed, the court maintained AEO designations of documents concerning a "non-party competitor" who has successfully "rebutted [the] argument that the information is stale." *Id*. at 1090-91.

[4] Plaintiffs imply, but do not confirm, whether the parties actually share any manufacturers. Even assuming they do, there would be less restrictive means than indiscriminately disclosing Quince's internal emails—which Plaintiffs themselves acknowledge contain other competitive information— to Plaintiffs' in-house counsel.



counsel is not involved in "competitive decision-making." *Biovail Labs., Inc. v. Anchen Pharms., Inc.*, 463 F. Supp. 2d 1073, 1084 (C.D. Cal. 2006) (denying in-house counsel access without a declaration regarding job duties and role in competitive decision-making); *see also Cadence*, 2018 WL 10582121, at *3; *Intel Corp.*, 198 F.R.D. at 527–32 (in-house counsel's need for access to discovery to direct litigation is insufficient to modify protective order when in-house counsel is engaged in competitive decision-making, which "create[s] an unacceptable risk of disclosure.").

Plaintiffs' own stated justifications confirm the risk. They declare they will use manufacturer identities to "enforce [their] intellectual property or contract rights" and pursue manufacturers who "breached any obligations to Coach." These purposes have nothing to do with the claims and defenses in this case. *Am. Roller*, 2006 WL 1371441, at *3. Plaintiffs' Footnote 7 claims they intend to submit declarations that their in-house counsel are not involved in competitive decision-making. But Plaintiffs have already told this Court exactly what they intend to do with Quince's manufacturer identities and no declaration can walk that back.[5] Deciding whether to pursue a competitor's supply chain partners is paradigmatic competitive decision-making. This is actual harm, not speculative harm under *PureCircle*[6] and *Splunk*.

### Plaintiffs' Statement

**<u>The Burden is on the Designating Party.</u>** Plaintiffs do not oppose the sealing of Defendant's material from public view, but challenge the Attorneys' Eyes Only-level treatment that Defendant has misapplied to the documents at issue. The Protective Order does not establish that any particular designation was made with good cause [ECF No. 32]; Quince bears the threshold obligation to demonstrate why its (many) AEO-level designations are proper as applied to each such document. *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011) (the party seeking protection bears the burden of showing good cause); *Water, Inc. v. Everpure, Inc.*, 2011 WL 13186051 at *2 (C.D. Cal. June 17, 2011) (rejecting designating party's argument that challenging party's failure to explain why the AEO designation was not proper; burden was on designating party); *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, 2013 WL 12212698 at *2 (N.D. Cal. Feb. 25, 2013). Quince improperly points to *Deckers* and the sealing from public view in this case, where no party challenged or had the opportunity to challenge disclosure to its in-house counsel. Skirting black letter precedent which assigns the good cause burden to the designating party, Quince instead rehashes an inapposite dispute raised in the *Deckers* case. Quince neglects to mention that Deckers did not challenge Quince's AEO designations; Quince was seeking to protect certain documents from *public* view, not from Deckers' in-house counsel. Quince also fails to show why it cannot resort to less restrictive means, like redacting pricing information and strategy that are not at issue. Quince has not shown good cause to support its over-designation of the disputed documents.

**<u>Identity of the Manufacturers and Evidence of Intentional Copying.</u>** While Quince blanketly designated all of its e-mails as AEO in contravention of the Protective Order [ECF No. 32 at p. 4],

---

[5] *Matsushita* did not use any of the terms Plaintiffs used in the explanatory parenthetical. It only concluded that the criteria is the "'advice and participation' in 'competitive decisionmaking'" not whether in-house counsel "have regular 'contact' with those who [do.]" *Matsushita*, 929 F2d at 1580.
[6] *PureCircle* in fact found the risk of competitive harm "speculative" because the Protective Order have ***already*** barred sharing AEO materials with in-house counsel, thereby eliminating the very risk the designating party claimed to fear. *PureCircle* also only permitted disclosure to ***outside*** counsel under a highly confidential designation. That is precisely the protection Quince seeks to retain here.



Seattle | New York | Los Angeles
www.moni.law

during meet and confer efforts Plaintiffs narrowed its challenges to a handful of e-mails they believe is pertinent to discuss with in-house counsel so that Plaintiffs can properly formulate their litigation strategies and prepare for trial. Courts recognize that AEO restrictions make "discovery and trial preparation significantly more difficult and expensive when an attorney cannot make a complete disclosure of relevant facts to a client." *See Global Material Technologies Inc. v. Dazheng Metal Fibre Co. Ltd.*, 133 F.Supp.3d 1079 (N.D. Ill. 2015); *Defazio v. Hollister, Inc.*, 2007 WL 2580633 at *2 (E.D. Cal. Sept. 5, 2007) ("plaintiffs should not be put in a position where they are essentially kept in the dark about the important facts of the case."); *see also Gryphon Domestic VI, LLC v. APP Int'l Fin Co.*, 28 A.D.3d 322, 326 (N.Y. App. Div. 2006) (documents should not be designated AEO when it "prevents counsel from fully discussing with their clients all of the relevant information in the case so as to properly formulate a defense to the action.").

Quince's conclusory statements as to why its manufacturers' identities should remain hidden do not address the likelihood of *actual* competitive harm, offering mere speculation. *See PureCircle USA Inc. v. SweeGen, Inc.*, 2020 WL 5260491 at *6 (C.D. Cal. July 20, 2020) (rejecting designating party's speculation that Plaintiffs "<u>might</u> use such ill-gotten information to attempt to interfere with Defendants' alleged existing relationship with the overseas manufacturer" and "<u>might</u> thereafter attempt to use that manufacturing process"); *Splunk Inc. v. Cribl,  Inc.*, 2024 WL 582712 at *1 (N.D. Cal. Feb. 13, 2024) ("vague boilerplate language or nebulous assertions of potential harm" are insufficient for sealing").

Based on the testimony of Quince's 30(b)(6) witnesses, there is a reasonable likelihood that Quince used Coach's manufacturers to develop the Accused Products. ECF Nos. 35-2, 35-3. As Coach also works with manufacturers outside of the U.S., its in-house counsel must learn the identities of such manufacturers to determine if they also work for Coach. If so, discovery may be needed. If they breached any obligations to Coach, they may also be named as defendants in this action. Otherwise, what if litigation counsel sues Coach's own manufacturer who did nothing wrong? These are all core aspects of litigation strategy that requires in house counsel's participation, and that Quince's over-designation thwarts. *See* 15 U.S.C. §§ 1125(a)(1), 1127; *Unilin Beheer B.V. v. NSL Trading Corp.*, 2015 WL 12698382 at *9 (C.D. Cal. Feb. 27, 2015) (identification of manufacturers for the products at issue is highly relevant to an infringement claim); *Woodall v. Walt Disney Company*, 2021 WL 2982305 at *6 (C.D. Cal. Apr. 14, 2021) (anyone in the distribution chain can be sued); *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (incrimination or exposure to further litigation is not a proper basis for sealing). Coach would be prejudiced if the manufacturers' identities were barred as they would not be able to further enforce its intellectual property or contract rights.

Quince also makes conclusory statements of competitive harm as to the evidence of intentional copying and development of copycat Coach products that have yet to be identified. Evidence of intentional copying does not merit AEO-level protection. As one Court noted: "[i]t is hard to imagine that how an email from one Balt employee to another, attaching an allegedly misappropriated trade secret of Plaintiff's, would qualify as AEO." *Microvention, Inc. v. Balt USA, LLC*, 2021 WL 4840786 at *7 (C.D. Cal. Sept. 8, 2021); *Splunk*, 2024 WL 582712 at *1 (in rejecting that the material could cause competitive harm: "this sealing request is really meant to hide unflattering statements related to claims and defenses in this litigation"). Further, intent or willfulness provides enhanced damages under 15 U.S.C. § 1117 and informs Coach's in-house counsel of the strength of the claims and available damages, which in turn informs any potential settlement, judgment, and litigation strategy. Quince's over-designation bars that analysis and



Seattle | New York | Los Angeles
www.moni.law

therefore prejudices Coach.

Quince's production shows that it targeted other Coach products as potential models for duplication. Coach's in-house counsel is entitled to know what other Coach products Quince may have intentionally copied to determine whether to add those products to this Action; it also shows a pattern of copying Coach. Information relating to other products Quince may have copied is not readily or publicly available, as Quince may have stopped selling those products by the time Coach searched for them, given them different names, or intended to develop those products but ultimately reversed course, including for fear of an infringement action. Quince's over-designations prejudices and prohibits Coach from being able to discuss pertinent issues germane to this case, which in turn thwarts Coach's litigation strategy.

**Coach's In-House Counsel Do Not Make Competitive Decisions.**  Coach's litigation counsel regularly consults with at least three members of Coach's in-house counsel. These three individuals are not involved in "competitive decision making" processes in light of Quince's business activities. *Live Eyewear, Inc. v. Biohacked, Inc.*, 2019 WL 8955426 at *4 (C.D. Cal. July 23, 2019) (permitting in-house counsel to view AEO information, finding sufficient evidence that counsel was not involved in competitive decision making with respect to similar or corresponding information about a competitor); *Newmark Realty Capital, Inc. v. BGC Partners, Inc.*, 2017 WL 8314677 at *2 (N.D. Cal. Aug. 7, 2017) (imposing certain safeguards to permit the opposing party's in-house counsel to view AEO material).

These members' job duties include advising Coach on legal and regulatory matters, including those relating to mergers and acquisitions, finance, due diligence, risk management, intellectual property, brand protection, and litigation. [7] *Matsushita Elec. Indus. Co., Ltd. v. U.S.*, 929 F.2d 1577, 1579-80 (Fed. Cir. 1991) (advising on litigation strategy, settlement, and whether to pursue additional parties or claims is legal work, not competitive decision making). These duties do not include directing Coach brand operational decisions relating to the design and development of products or the selection of manufacturers; their input extends to intellectual property clearance, as well as compliance and contract-related matters. For this litigation, in-house counsel would properly advise on whether discovery should be sought from any manufacturers, whether the manufacturers are proper defendants, any potential breach of contract issues, settlement decisions, litigation strategy in light of the evidence of intentional copying and copying of other products, and whether to add additional potential infringing products to the matter. Thus the disclosure of Quince's manufacturer identities, evidence of intentional copying, and other potentially infringing products to in-house counsel would not cause competitive harm to Quince.[8] By contrast, Coach would be prejudiced from the non-disclosure as discussed herein. Coach's in-house counsel members would agree to the redaction of sensitive information such as pricing strategy as discussed above, or other appropriate measures.

---

[7] This Court's rules prohibit any affidavits from being submitted, but Plaintiffs can if permitted.

[8] If any party is to be concerned about the kind of competitive harm fit for AEO designation, it would be Coach – not Quince. This case is about Quince copying Coach's Rogue and Soho Flap bags, down to potentially using the same manufacturers for those handbags. Coach is a renowned handbag and accessory company that has been making and selling products for more than 80 years. Coach has its own internal design team while Quince does not. Quince's business model is centered around copying other best-selling items in the market, most often from established brands like Coach, including potentially intentionally engaging Coach's manufacturers as part of its scheme.



Seattle | New York | Los Angeles
www.moni.law